UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 10-CV-034-JBC

CALVIN LEE GODDARD, PLAINTIFF

V. **MEMORANDUM OPINION AND ORDER**

JASON TERRIS, et al., DEFENDANTS

\*\*\*\* \*\*\*\* \*\*\*\* \*\*\*\*

The Court considers Defendants' motion to dismiss or, alternatively for summary judgment [R. 24]; Plaintiff's motion to dismiss Defendants' motion to dismiss or, alternatively for summary judgment [R. 41]; and Plaintiff's motion for summary judgment [R. 28]. For the reasons explained below, the defendants' motion will be granted, the plaintiffs' motions will be denied, and this case will be dismissed.

## BACKGROUND

Calvin Goddard, an inmate at the Federal Medical Center in Lexington, Kentucky ("FMC-Lexington"), filed this action, pursuant to the doctrine set forth in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), against the following persons in their individual capacities: FMC-Lexington Warden, Deborah A. Hickey; FMC-Lexington Clinical Programs Associate Warden, Jason A. Terris; FMC-Lexington Clinical Director, Michael Growse; and former FMC-Lexington Medical Officer, Luis Morales[1]. Goddard

---

[1] Defendants' counsel advises that Luis Morales was employed as a medical doctor at FMC-Lexington from August 14, 1996, to February 28, 2010, and that he is currently employed as a medical doctor by the United States Department of

alleges that the defendants were deliberately indifferent to his serious medical needs, in violation of his Eighth Amendment right to be free from cruel and unusual punishment, by their failure to honor his request to be scheduled for a medical consultation with Drs. Patil, Hom, and Barret, physicians at the Cincinnati Medical Center ("CMC") in Cincinnati, Ohio, regarding possible nerve graft surgery to the left side of his face and neck to eliminate/reduce the partial paralysis resulting from his prior cancer treatment and surgery. These physicians at CMC had previously treated him for cancer, including surgery to the left side of his face and neck to remove the cancerous tissue. Goddard seeks $50,000,000.00 in compensatory and punitive damages and an injunction compelling the Bureau of Prisons ("BOP") to schedule a consultation for him with these specific physicians at the CMC.

**GODDARD'S MEDICAL RECORD**

To fully assess this matter, a review of Goddard's medical record both before and after his incarceration at FMC-Lexington is necessary, as he was treated for a serious medical condition before his arrival at FMC-Lexington.[2]

---

Veterans Affairs ("USVA").

[2] Goddard arrived at FMC-Lexington on January 26, 2009, after having been convicted in the Eastern District of Kentucky for attempting to possess with intent to deliver 500 grams or more of cocaine, and is serving a 180-month sentence. His projected release date is September 30, 2021. [See Inmate Profile, Attachment A to Declaration of Carlos J. Martinez - DE #21-4].

**A.     Goddard's medical record before incarceration at FMC-Lexington**

In 2007, Goddard was diagnosed with large-cell neuroendocrine carcinoma in the head/neck. On May 17, 2007, he underwent extensive surgical resection of his left hemiface at the CMC, sacrificing his left facial nerve, with a right forearm flap. Following surgery, he underwent seven weeks of radiation treatment. In December 2007, a follow-up CT scan of the neck/head revealed a tumor on the right side that was classified as a small-cell carcinoma. On February 21, 2008, Goddard underwent right radical neck surgery, followed by seven more weeks of radiation therapy. Also, his physicians prescribed four courses of chemotherapy, but Goddard received only two treatments due to the resulting nausea. His last treatment was on August 5, 2008. [See Attachment B to Declaration of Michael Growse - DE #21-9]; BOPREC NO. 0008-0012 - DE #21-10].

Upon Goddard's arrival at FMC-Lexington on January 26, 2009, Health Services performed a screening and evaluation. Goddard's comments regarding his May 2007 left jaw surgery, radiation therapy, and chemotherapy were noted. Goddard stated that he required PET scans every sixty days. His medication orders were renewed, including Naproxen 500mg, Oxycodone 5/325mg, two tablets three times per day, Fluoride cream and Docusate Sodium 100mg, one capsule two times a day. [See Attachment B to Declaration of Michael Growse - DE #21-8];BOPREC NO. 0001-0007 - DE #21-10].
here 2-18-11   6:30 p.m.

**B.     Goddard's medical record after arrival at FMC-Lexington**

On January 28, 2009, Dr. Morales examined Goddard at a clinical Chronic Care visit, requested an oncology evaluation, and reported that Goddard stated that he needed

3

a PET scan. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0008-0012 -DE #21-10]. Subsequently, Goddard has compiled an extensive medical record, which is chronologically summarized below:

On March 4, 2009, Goddard was transported to the University of Kentucky Medical Center in Lexington, KY ("UKMC") for PET and CT scans, which showed no evidence of cancer recurrence. Upon his return from the PET and CT scans, Goddard had a post-consultation visit with FMC-Lexington's Health Services.

On March 12, 2009, Goddard was evaluated at the UKMC Hematology /Oncology Clinic by Dr. Allison Marie Prinz, Fellow Division of Hematology/Oncology, and by Dr. Susanne Arnold, Associate Professor of Medicine, Division of Hematology/Oncology. The clinical notes stated that Goddard was then without evidence of disease and suffers from a partial left facial paralysis and numbness secondary to a facial nerve sacrifice. The oncologist planned on seeing Goddard every three (3) months with Goddard was also evaluated on March 12 at FMC Lexington's Health Services upon his return from the consultation at the UKMC. Pursuant to the oncologist's treatment plan, a request for a follow-up PET scan and an Oncology review was noted to be scheduled in another three months. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0033-0037 -DE #21-11, #21-12].

On April 3, 2009, after Goddard presented Dr. Morales with a court order allegedly requesting evaluation for a possible nerve graft, Dr. Morales requested a neurology consultation. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0038 -DE #21-12]. On May 19, 2009, Goddard was seen by a specialist at the Neurology Clinic. Upon review of the neurology consultation report, on May 20, 2009, Dr. Morales requested

a radiology examination, a follow-up neurology consultation, and a neurosurgery evaluation/consult for a nerve graft. [Attachment B to <u>Declaration of Michael Growse</u> - DE #21-8; UKREC 0005 -DE #21-19].

On May 29, 2009, Goddard was taken to the UKMC Radiology Department for a PET scan and a CT Scan of the neck. The CT scan showed a normal exam with no evidence of metastatic disease. The PET scan showed no internal hypermetabolic lesion to suggest cancer recurrence. [Attachment B to <u>Declaration of Michael Growse</u> - DE #21-8; UKREC 0006-0008 - DE #21-19].

On June 2, 2009, Goddard was taken to an ENT/Oncology consultation at the UKMC. Dr. Thomas L. Gal, Jr., Associate Professor at the UKMC, Otolaryngology - Head & Neck Surgery, reported that Goddard was seen in follow-up and that the examination of his PET scan revealed no evidence of disease. As to nerve graft surgery, Dr. Gal felt that the chance of success was fairly low due to degeneration and expressed a concern in the ability to find the proximal stumps. Dr. Gal recommended waiting for the pending evaluation by neurosurgery and a follow-up PET scan in three (3) months. On June 3, 2009, Dr. Morales reviewed the Oncology consultation. Finding no sign of active disease, he requested a follow-up oncology examination with a PET scan and radiology in three months. [Attachment B to <u>Declaration of Michael Growse</u> - DE #21-8; BOPREC 0057-0058 -DE #21-13].

On June 4, 2009, Dr. Mary A. Phillips, of the UKMC, Division of Hematology/Oncology, wrote a letter stating that she was seeing Goddard along with Dr. Susanne Arnold for follow-up of his metastatic Merkel cell carcinoma. Dr. Phillips's review of Goddard's CT and PET scans revealed no suspicious modules, pleural effusion,

5

pericardial effusion, or lymphadenopathy, and no evidence of metastatic disease. Dr. Phillips recommended continued monitoring every three (3) months. Goddard was also scheduled to see an ENT for continued monitoring. On June 4, 2009, Dr. Susanne Arnold wrote a hematology/oncology clinic note stating that the scans showed a stable disease and that she would plan on seeing Goddard every three (3) months. On the same date, a chronic care visit was conducted at FMC-Lexington's Health Services where Dr. Morales informed Goddard of the recent findings, and the treatment plans were discussed pursuant to the evaluations of the consultants. On June 5, 2009, Dr. Morales made a radiology request for a CT scan of the neck and chest for a neurosurgery review. On June 17, 2009, a radiology procedure for a PET scan was requested along with the prior request for a CT scan. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0060-0065 -DE #21-13, #21-14].

On August 3, 2009, Goddard was seen at the UKMC for a neurosurgery follow-up evaluation. On the same date Dr. Robert D. Owen, Assistant Professor of Neurosurgery at the UKMC, wrote a consultation report stating that the Plaintiff's CMC plastic surgeon apparently told Goddard that in the future he may be a candidate for a facial nerve reanimation procedure. However, Dr. Owen stated that he was pessimistic that the facial nerve reanimation procedure would be of any benefit. Dr. Owen also noted that he had never conducted such surgery and that it would be better for Goddard to be seen by the surgeon who told him that he could perform the procedure. On August 4, 2009, a follow-up to the neurosurgery evaluation was performed at Health Services. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0071-0072 -DE #21-14].

On August 5, 2009, a chronic care visit was performed at FMC-Lexington's Health

Services. In response to Goddard's complaints about the neurology clinic at the UKMC, he was then seen by a neurosurgeon at the UKMC, who informed Goddard that he would not operate on him, but would defer such surgery to the doctor at the CMC who performed Goddard's facial reconstruction. On that same date, Dr. Morales requested an evaluation of Goddard at the CMC Barrett Cancer Center, as recommended by the UKMC Oncology ENT Specialist. Dr. Morales noted that the follow-up PET scans have shown remission, but that the Court requested reconstruction of nerve paths for rehabilitation to his left hemiface. Dr. Morales noted that ENT/Neurology/Oncology at the UKMC deferred the requested surgery to the physician who originally operated on Goddard at the CMC. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0073-0075 -DE #21-14].

On August 11, 2009, Goddard was followed up by Dr. Franca Cambi, Professor of Neurology at the UKMC, who noted that Goddard was seen by the neurosurgeons at UKMC for the possibility of a nerve graft and that they did not feel comfortable intervening. Dr. Cambi suggested that the Plaintiff be seen at the CMC where the original surgery was performed. Dr. Cambi also reported that the ENT physician who examined Goddard was skeptical about the possibility of a successful graft given the time lag between the surgery and the resection of the nerve. Dr. Cambi stated that Goddard may be a candidate for a nerve graft and that the recommendation to follow up with the Cincinnati physician on the feasibility of the graft is a reasonable one. In the alternative, Dr. Cambi recommended an EMG to probe the viability of the stumps of the facial nerve. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0076-0081 -DE #21-14, #21-15].

On August 20, 2009, Dr. Morales obtained the neurologist's dictation and requested an MRI, pursuant to the recommendation of the UKMC neurologist. Additionally, Dr.

7

Morales noted that an evaluation at the CMC had been requested and was pending. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0082-0083 - DE #21-15]. On August 21, 2009, Dr. Morales was verbally notified that the Utilization Review Committee ("URC") had disapproved his request for a referral to the CMC. At that time, the URC did not consider referral to the CMC to be a viable alternative. Instead, the URC recommended that the facial EMG be requested by the UKMC neurologist. Dr. Morales followed up with the URC's recommendation by requesting a facial EMG to prove the viability of the stumps of Goddard's left facial nerve as recommended by the URC and the UKMC neurologist. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0084-0085 - DE #21-15].

Goddard received another PET scan and CT scan at UKMC on September 8, 2009. The PET scan showed no interval appearance of metastatic disease. The CT scan showed a clear chest with no evidence of primary or metastatic disease and an otherwise unremarkable exam. There was no evidence of cervical adenopathy or any bony metastatic disease. [Attachment B to Declaration of Michael Growse - DE #21-8; UKREC 0010-0013 - DE #21-19].

On September 14, 2009, Dr. Mary A. Phillips from the UKMC Chandler Medical Center, Division of Hematology/Oncology, re-evaluated the Plaintiff. Dr. Phillips reported that the CT and PET scans showed no evidence of recurrent or metastatic disease and recommended a follow-up in four (4) months. On this same date, a post-consultation follow-up was conducted at FMC Lexington's Health Services. On September 15, 2009, Dr. Morales requested a follow-up radiology consultation and oncology re-evaluation in four (4) months, as recommended by Dr. Phillips. Also, on September 15, Dr. Franca Cambi

of the UKMC Department of Neurology and Neurosurgery wrote a note regarding a follow-up of the facial palsy condition and the possibility of a graft to reestablish function and anatomical integrity to the nerve. Dr. Cambi referred Goddard back to the CMC as the neurosurgeons at the UKMC did not feel comfortable about doing the procedure. A review of the available PET and CT scans showed no appearance of metastatic disease. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0089-0092 - DE #21-15].

On October 26, 2009, an EMG test was done at the UKMC. The EMG test and Neurology consultation found left facial neuropathy with evidence of continuity to some but not all facial innervated muscles. Goddard was diagnosed with facial neuropathy. [Attachment B to Declaration of Michael Growse - DE #21-8; UKREC 0015 - DE #21-19]. On October 27, 2009, a letter from the UKMC Neurology Department dated September 15, 2009, was received and reviewed at FMC-Lexington. The letter described the UKMC findings on the CT scans. In addition, the facial EMG was received and reviewed. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0095-0097 - DE #21-16].

On November 5, 2009, Dr. Morales requested another neurology consultation and re-evaluation, which was performed, and on November 22, 2009, Dr. Morales reviewed the consultation. He noted that a PET scan and follow-up consult had already been requested. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0098-0104 - DE #21-16].

On December 2, 2009, Dr. Morales consulted with Goddard, provided him with a copy of the facial EMG, and informed him that the EMG has to be finally interpreted by the

9

neurologist. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0105-0111 - DE #21-16; DE #21-17].

On January 4, 2010, Goddard was seen by neurosurgery at UKMC, and it was recommended that he see Dr. Vasconez at the UKMC Plastic Surgery Department for the feasibility of a facial nerve reanimation procedure, and on that date, a consultation request was made for an evaluation with Dr. Vasconez for a possible facial nerve reanimation procedure. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0112-0114 - DE #21-17].

On January 11, 2010, Goddard consulted with Dr. Susanne Arnold at the UKMC Markey Cancer Center, Division of Hematology/Oncology. The recent PET and CT scans performed on January 6, 2010, were reviewed and showed no evidence of recurrent disease, change, or metastatic disease in the neck or chest. The assessment consisted of remission and left facial paralysis. Dr. Arnold recommended that Goddard be sent back to the CMC to consider a possible nerve graft. The next day, January 12, 2010, Goddard was seen at the Neurology Clinic. On January 19, 2010, Dr. Susanne Arnold wrote a report of her consultation with Goddard. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0121-0124 - DE #21-17].

On January 20, 2010, Plaintiff's oncology consult was reviewed and new consultation requests were made for a CT scan, PET scan, oral surgery consult and oncology follow up. The oncology report recommended a referral to the CMC for a nerve graft in order to improve function. The recommendation stated that the nerve graft is not cosmetic and needs to be done within two (2) years of the injury. It was noted that Goddard is scheduled to see Dr. Vasconez from the UKMC Plastic Surgery Department

regarding the nerve reanimation surgery in order to follow his recommendations. Appointments were made with an oral surgeon consultation for January 26, 2010, for a CT scan and a PET Scan on July 6, 2010, and a follow-up visit with Dr. Susanne Arnold on July 12, 2010. [Attachment B to Declaration of Michael Growse - DE #21-8; BOPREC 0125-0127 - DE #21-18].

## DISCUSSION

Goddard's medical record establishes that the defendants have not been deliberately indifferent to his medical needs. Upon his arrival at FMC-Lexington on January 26, 2009, he underwent a Health Services screening, and he was examined by Dr. Morales on January 28. Given his prior surgery and treatment for cancer, and his need for periodic testing to determine whether treatment might be needed for any cancer recurrence, Goddard was transported regularly to UKMC for PET scans and CT scans, approximately every three months.[3] Additionally, he was examined and evaluated by a host of UKMC specialists, including various neurologists, neurosurgeons, and physicians in the UKMC Hematology/Oncology Clinic and the Ear, Nose, and Throat (Otolaryngology) department, resulting in his being regularly monitored and tested at UKMC to ascertain whether he required treatment for any cancer recurrence.

Concerning Goddard's request for nerve graft surgery to alleviate the partial paralysis to the left side of his face, the specialists at UKMC were reluctant to perform this surgery, concluding that the surgeons at CMC, where Goddard underwent prior surgeries

---

[3] In 2009, Goddard received PET scans on March 4, May 29, and September 8. In 2010, he received a PET scan on January 6; another PET scan was scheduled for July 6. All PET scans have shown no cancer recurrence.

for cancer, should perform this nerve graft surgery, and they recommended that Goddard consult with physicians at CMC about that surgery. This recommendation by UKMC specialists was processed at FMC-Lexington according to the procedures prescribed by BOP Program Statement P6031.01, Patient Care.

Paragraph 7 of BOP Program Statement P6031.01 outlines and defines the five major levels of medical care provided to inmates, as follows:

- a. **Medically Necessary - Acute or Emergent**.
- b. **Medically Necessary - Non-Emergent.**
- c. **Medically Acceptable - Not Always Necessary.**
- d. **Limited Medical Value.**
- e. **Extraordinary.**

Program Statement, P6031.01, Patient Care, 1/15/05, pages 4-6.

The BOP considered Goddard's request for nerve graft surgery to be an elective procedure and classified it under subsection "c" of Paragraph 7 as "Medically Acceptable - Not Always Necessary," which provides, in part, that:

> These therapeutic interventions always require review by the Institution Utilization Review Committee. Relevant factors to consider in approving the proposed treatment in this category include, but are not limited to:
>
> - the risks and benefits of the treatment;
> - available resources;
> - natural history of the condition; and
> - effect of the intervention on inmate functioning in his/her activities of daily living.

*Id.* at 6.

Based on the classification of the nerve graft surgery request, Dr. Morales could not act unilaterally on the recommendation by the UKMC specialists regarding Goddard's requested nerve graft surgery and was required to submit that request to the Utilization

Review Committee ("URC") for approval, pursuant to Paragraph 8 of BOP Program Statement P6031.01, which provides that every institution will have an established URC. The URC is chaired by the Clinical Director, and at a minimum, is comprised of the following additional members: Health Services Administrator ("HSA") or Assistant HSA; Medical Trip Coordinator; Health care provider(s) directly involved in the reviewed cases; Director of Nursing (if applicable); and a chaplain or social worker.

The URC reviewed Goddard's request for referral to the CMC for nerve graft surgery. Upon review of the various medical examinations, evaluations, and consultations Goddard had had while at FMC-Lexington, the URC disapproved that request because the URC did not consider it to be a viable alternative. However, in lieu of a referral to CMC, the URC recommended that a facial EMG be requested at the UKMC. BOP Program Statement P6031.01 provides that the URC and the Clinical Director can make their own medical decisions and are under no obligation to follow a consultant's recommendation. It is not the function of the URC to simply "rubber-stamp" a consultant's recommendation.

The fact that the URC declined to follow the recommendation of the UKMC specialists to refer Goddard to the CMC for further evaluation does not constitute deliberate indifference to his medical needs or a denial of his Eighth Amendment rights. In lieu of such referral, the URC concluded that a facial EMG would be the better course of action. The results of that procedure might provide the URC with additional medical information, which could change the URC's decision on this matter, if revisited at a later date.

In summary, Goddard has received treatment for his medical conditions at FMC-Lexington, and this treatment is based on the recommendations of various specialists and

the professional judgment of the BOP physicians in charge of his care. In respect to his request for nerve graft surgery, he has been evaluated by a head and neck surgeon, a neurosurgeon, an ENT physician, and a neurologist at the UKMC. Although the URC did not approve his request to be seen at the CMC for nerve graft surgery consultation, the URC did not blindly disapprove that request or look at it in a vacuum. At that juncture, the URC simply concluded that a facial EMG at UKMC was the better option, and a facial EMG was scheduled. On October 26, 2009, Goddard had a facial EMG at UKMC. Thus, Goddard's request for a nerve graft surgery has not been disregarded or ignored, as various treatment options have been sought and considered by specialists at the UKMC.

Goddard is not satisfied with the medical care and treatment he has been provided at FMC-Lexington, and he has a difference of opinion with his medical care providers as to what his course of treatment should be. Differences of opinion regarding diagnosis or treatment are not actionable under *Bivens*, as they do not establish that the defendants have been deliberately indifferent to his medical needs or condition. "Deliberate indifference" means that prison medical staff knew of the inmate's serious medical needs, but intentionally disregarded an excessive risk of harm to the inmate, or that prison guards or medical staff intentionally prevented the inmate from receiving prescribed treatment or intentionally delayed or denied him access to medical care. *Estelle v. Gamble*, 429 U.S. 97, 104-05(1976); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference may be "manifested by prison doctors in their response to a prisoner's needs or by prison [staff] in intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed." *Id.* at 104.

14

No claim of a constitutional dimension is stated where a prisoner challenges only matters of medical judgment or otherwise expresses a mere difference of opinion concerning an appropriate course of treatment. *Sharpe v. Patton, et al.*, No. 08-CV-58-HRW, 2010 WL 227702 (E.D. Ky. 2010). When the cause of action is based on an allegation that the prescribed treatment was inadequate in some way, rather than on an allegation that the prison official failed to provide the plaintiff with any treatment, courts traditionally have been reluctant to second-guess the medical official. *Rodriguez v. Lappin*, 08-CV-347-GFVT, 2009 WL 2969510 (E.D. Ky. 2009). Simply put, differences of opinion as to matters of medical judgment, negligent treatment or even medical malpractice are insufficient to establish that one has received inadequate medical care in violation of the Eighth Amendment. *See, e.g., Greer v. Daley*, No. 01-C-586-C, 2001 WL 34377922, 3 (W.D. Wis. 2001). In *Greer*, some of the inmate's physicians requested surgery to correct a deviated septum, but that request was denied by other physicians, including the Medical Director, based on their medical opinion that surgery was unnecessary. The court in *Greer* held that the dispute among medical professionals concerning the inmate's need for the surgery in question does not rise to the level of an Eighth Amendment claim for inadequate medical care.

As in *Alexander v. Federal Bureau of Prisons*, 227 F. Supp.2d 657 (E.D. Ky. 2002), where this court granted a motion for summary judgment for failure to state a claim for deliberate indifference to medical needs:

> . . . While it appears that the plaintiff has not gotten what he wants, what he wants is not the issue. Ordering a specific type of surgery is not the appropriate function of this Court. The Court agrees with the defendants that, at most the plaintiff has alleged a difference in opinion between the plaintiff

and his health care providers regarding the expediency of a specific treatment. This does not generally create a constitutional claim.

*Id*. at 666.

In the absence of a showing of "deliberate indifference," Goddard has failed to state a Constitutional claim arising under the Eighth Amendment. Consequently, summary judgment will be granted to the defendants, pursuant to Fed.R.Civ.P. 56(c).[4]

## CONCLUSION

Accordingly, **IT IS ORDERED** as follows:

(1) Defendants' motion to dismiss, or in the alternative, motion for summary judgment [R. 24] is **GRANTED.**

(2) Goddard's motions [R. 28, 41] are **DENIED**.

(3) All claims having been resolved, this action is **DISMISSED** and **STRICKEN** from the docket.

(5) Judgment in favor of the defendants shall be entered contemporaneously with this Memorandum Opinion and Order.

Signed on February 22, 2011



JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

---

[4] A motion made under Fed.R.Civ.P. 12(b)(6) which is accompanied by materials outside the record may be converted into a motion for summary judgment and measured by Rule 56. Fed.R.Civ.P. 12(d).